```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2-1-13
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

GUN HILL ROAD SERVICE STATION, INC.
and IBRAHIM ISSA,

                    Plaintiffs,                                  08 Civ. 7956 (PKC)

          -against-                                              MEMORANDUM
                                                                AND ORDER

EXXONMOBIL OIL CORPORATION,

                    Defendant.

-------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

             For several years, plaintiffs Ibrahim Issa and Gun Hill Road Service Station, Inc.

("GHRSS") operated a Mobil-brand gas station on Gun Hill Road in the Bronx, New York.

Plaintiffs have brought suit against defendant ExxonMobil Oil Corporation ("ExxonMobil")

alleging that ExxonMobil violated the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C.

§§ 2801-2807, a federal statute regulating certain aspects of automotive gasoline franchise

relationships, when it terminated the franchise relationship between ExxonMobil and GHRSS.

Plaintiffs also allege state-law claims related to the station on Gun Hill Road and a second station

on City Island Avenue in the Bronx.  By letter dated August 31, 2012, plaintiffs sought to

withdraw Counts II, IV, and X of the Third Amended Complaint (the "complaint" or "Compl.").

The Court granted plaintiffs' withdrawal request at oral argument on January 15, 2013.  (Tr. 2-

3.)[1]  Defendant now moves for summary judgment under Rule 56, Fed. R. Civ. P., with respect

to plaintiffs' remaining claims.

---

[1] All references to "Tr." refer to the transcript of oral argument held on January 15, 2013.

The Court will address defendant's motion in two parts, corresponding to two distinct sets of facts raised in the complaint.  First, the Court will address plaintiffs' claims related to the Gun Hill Road station.  These claims primarily turn on whether the parties entered into a binding oral modification of the automotive gasoline franchise agreement between GHRSS and ExxonMobil.  As will be discussed, the Court concludes that, under New York law, there was no enforceable oral modification of the agreement.  Second, the Court will address plaintiffs' claim that defendant tortiously interfered with Issa's prospective business relationship with a third party at the City Island Avenue station.  As will be discussed, the Court concludes that this claim fails as a matter of law and is in any case untimely.

Thus, for the reasons set forth below, defendant's motion for summary judgment is granted, except with regard to Count VI, which raises triable issues of fact as to ExxonMobil's compliance with its obligations under the parties' agreements to maintain the Gun Hill Road station's computer system and ensure that certain construction was performed in a workmanlike manner.

I.   <u>Summary Judgment Standard</u>

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  "The mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).  A factual dispute is material if it "might affect the outcome of the suit under the governing law."  <u>Id.</u> at 248.  A dispute about a material

fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The moving party bears the burden of identifying matters that it believes demonstrate the absence of a genuine issue of material fact, see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and all reasonable inferences are drawn in favor of the nonmoving party, see Scott v. Harris, 550 U.S. 372, 378 (2007); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  In deciding the motion, the court may rely on "any material that would be admissible or usable at a trial."  Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008) (citation and quotation marks omitted); Rule 56(c)(2), Fed. R. Civ. P.  However, "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Anderson, 447 U.S. at 225.

II.  Claims Related To The Gun Hill Road Station

a.  Factual Background

The following facts are either not in dispute or, where there is a dispute, the evidence is viewed in the light most favorable to plaintiffs, as the non-movants.[2]

---

[2] On December 5, 2012, ExxonMobil moved to strike plaintiffs' responses to ExxonMobil's statement of undisputed facts pursuant to Local Rule 56.1 ("Def. 56.1").  In deciding the present motion for summary judgment, the Court will consider only plaintiffs' supplemented responses ("Pl. 56.1").  ExxonMobil's motion to strike plaintiffs' responses is otherwise denied.

Separately, the Court notes that plaintiffs submitted "corrected" versions of their brief in opposition to ExxonMobil's motion for summary judgment and the affidavit of Ibrahim Issa.  The Court considers only the revised versions of these documents in addressing the present motion for summary judgment.

The Court also notes that ExxonMobil moved, by letter brief dated December 21, 2012, to strike plaintiffs' references to the amount of a buyout offer in plaintiffs' motion papers as inadmissible under Rule 408, Fed. R. Evid. Because the Court does not rely on the buyout offer in deciding the present motion for summary judgment, it need not resolve ExxonMobil's December 21 motion.

In or about November 2000, Issa acquired the right to operate the gas station located at 688 East Gun Hill Road, Bronx, New York (the "Gun Hill Station").  (Issa Aff. ¶¶ 5, 6.)[3]  Issa already operated a nearby station with a convenience store and he intended to operate the Gun Hill Station as a station with an automotive repair shop.  (Id. ¶ 4.)  On November 15, 2000, ExxonMobil and GHRSS entered into a franchise agreement for the Gun Hill Station. (Def. 56.1 ¶ 17; Pl. 56.1 ¶ 17.)

In January 2001, Tulio Lopez, ExxonMobil's Territory Manager, visited Issa at the Gun Hill Station and informed him that ExxonMobil had decided to convert a portion of the station site into a convenience store, and that Issa should not invest any money in a repair shop. (Issa Aff. ¶ 8.)   After further assurances from ExxonMobil representatives that a convenience store would be more profitable than a repair shop and that the necessary construction could be undertaken expeditiously, and after Lopez indicated that if Issa failed to cooperate he would cease to receive support from ExxonMobil, Issa agreed to convert the Gun Hill Station to an ExxonMobil "On the Run" or "OTR" convenience-store site, which would also sell gasoline. (Id. ¶¶ 10-12.)  Issa stopped promoting his repair shop at the Gun Hill Station and consequently incurred operating losses each month.  (Id. ¶ 13.)

In October 2002, about a year and ten months after the initial Lopez-Issa conversation, Brett Atherton, ExxonMobil's OTR Sales and Merchandising Manager for New York City, informed Issa that, based on revised projections, ExxonMobil no longer planned on building an OTR site at the Gun Hill Station.  (Id. ¶ 17.)  Then, in December 2002, Atherton about-faced and told Issa that ExxonMobil was again interested in constructing an OTR site at the Gun Hill Station because ExxonMobil had purchased additional land behind the station that

---

[3] Unless otherwise indicated, all references to "Issa Aff." refer to the Affidavit of Ibrahim Issa dated November 12, 2012, not a second affidavit by Issa dated January 4, 2013.

would allow for a larger store, additional fuel pumps, and more parking, all of which were projected to make the project more profitable.  (Id. ¶ 21.)  Atherton indicated that ExxonMobil would retaliate against Issa at all of his ExxonMobil locations if he did not agree to the conversion.  (Id. ¶ 24.)   ExxonMobil representatives also told Issa that if he agreed to the conversion his rent at the Gun Hill Station would be limited to $12,300 per month for the duration of his franchise agreement, instead of the $23,000 per month it would otherwise be with the additional land.  (Id. ¶¶ 25, 26.)  In January 2003, Issa agreed to the conversion for a second time.  (Id. ¶ 27.)

On January 15, 2003, ExxonMobil and GHRSS entered into a new ten-year franchise agreement for the Gun Hill Station, effective December 1, 2002 (the "Franchise Agreement").  (Def. 56.1 ¶ 18; Pl. 56.1 ¶ 18.)  Pursuant to the Franchise Agreement, GHRSS leased the premises from ExxonMobil and agreed to purchase gasoline from ExxonMobil and operate the premises as a Mobil-brand service station.  (Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19.)  Consistent with industry practice, the Franchise Agreement states ExxonMobil may electronically draft funds from an account owned by GHRSS in order to satisfy the franchisee's payment obligations.  (Finn Decl. Ex. 7 § 2.3(b); Tr. 17.)  The Franchise Agreement states that it may be terminated "in accordance with the applicable provisions of the PMPA . . . ."  (Finn Decl. Ex. 7 § 14.1(a).)  It further states that the Franchise Agreement contains the parties' entire agreement and supersedes all prior agreements, that there are no binding representations or warranties other than those in the Franchise Agreement, and that modifications to the Franchise Agreement are not effective unless agreed to in writing by both parties.  (Id. § 20.8.)  An amendment to the Franchise Agreement, also dated January 15, 2003, established a new base rent of $13,233 per month.  (Finn Decl. Ex. 10.)  It also stated that no rent would be charged for the first three

months following completion of construction and that the base rent would be reduced by 50% for the fourth, fifth, and sixth months following completion.  (Id.)  The full base rent was to take effect on the first day of the seventh month following completion of construction.  (Id.)

Also on January 15, 2003, GHRSS and ExxonMobil entered into an On The Road Franchise Agreement (the "OTR Agreement").  (Def. 56.1 ¶ 21; Pl. 56.1 ¶ 21.)  The OTR Agreement states that it is contingent upon GRHSS having entered into ExxonMobil's standard franchise agreement and that termination of either agreement by ExxonMobil triggers termination of the other.  (Finn Decl. Ex. 8 §§ 2.02, 14.05(C).)  Like the Franchise Agreement, the OTR Agreement recites that it contains the parties' entire agreement, supersedes all prior agreements, and can only be modified if agreed to in writing by both parties.  (Id. § 19.02.)

The Gun Hill Station closed in May 2005, construction began in June 2005, and the station reopened in December 2005.  (Issa Aff. ¶ 30; Issa Dep. 242; Tr. 16.)  After the active construction phase ended, however, the convenience store was plagued by problems, such as malfunctioning refrigeration equipment and computer software; these problems required repairs and caused Issa to lose business revenue.  (Issa Aff. ¶¶ 31-41.)  In April 2006, Sameer Desai, ExxonMobil's Franchise Specialist, orally told Issa that ExxonMobil was aware of these problems and had agreed that (i) ExxonMobil would not charge Issa any rent until the problems at the OTR site were fixed, and (ii) ExxonMobil would defer charges for equipment and gas until the OTR problems were corrected and the parties agreed on a payment schedule.  (Id. ¶ 33.)  On May 3, 2006, Sean Duffy, ExxonMobil's Dealer Manager for New York and New Jersey, visited the site and orally confirmed this agreement.  (Id. ¶ 34.)  In an email to Issa dated September 14, 2006, Duffy noted that "[w]e have not charged rent since the station opened, . . . we have delayed drafts for two loads of gasoline, and we have not drafted you for the equipment charges

6

at your station," amounting "to approximately $175,727.28 that we have delayed drafting, along with approximately $104,000 in rent waived to date."  (Issa Aff. Ex. 5.)

In fact, beginning in March 2006 ExxonMobil drafted payments from plaintiffs' bank account for rent; Issa maintains he was orally told that such drafts were for bookkeeping purposes and that ExxonMobil would deposit rent credits in equal amounts.  (Issa Aff. ¶ 44.) Although ExxonMobil did deposit credits, in some instances the lag time between drafting and crediting resulted in gasoline drafts being returned unpaid for Not Sufficient Funds ("NSF").  (Id. ¶¶ 46-49.)  These NSFs would eventually, in accordance with ExxonMobil policy, affect the terms on which plaintiffs could purchase gasoline from ExxonMobil.  (Id.)

On February 8, 2007, Issa met with Jim McDonald, Sean Duffy, and Travis Roundtree of ExxonMobil at the Gun Hill Station.  (Id. ¶ 53.)  McDonald stated that "it was time for a divorce" and told Roundtree to start charging Issa rent.  (Id.)  According to Issa, the meeting concluded with McDonald and Issa agreeing that ExxonMobil would not charge Issa rent, and ExxonMobil would continue deferring various charges, until the parties resolved their disagreements or agreed to a buyout of the Gun Hill Station.  (Id. ¶ 54.)

On July 16, 2007 Duffy informed Issa by email that, due to his repeated NSFs, he would be required to pay in advance for gasoline purchases and that ExxonMobil "would not be extending credit until further notice."  (Issa Aff. Ex. 20.)  The following day, Colette Hayman of ExxonMobil mailed Issa a formal prepay notification letter, confirming that Issa's "account is now on prepay payment terms for gasoline purchase," and instructing him that "[w]hen you require gasoline, advance payment in full is required prior to the load being released."  (Finn Decl. Ex. 9.)  Due to the financial losses he had already suffered, Issa found it financially unworkable to pay in advance for gasoline.  (Issa Aff. ¶ 68.)

Also on July 17, 2007, Duffy informed Issa by letter that "in order to assist you, we have made a business decision to give you retroactive credit for rent for the months of February (3 weeks), March, April, May June and one week of July, 2007," but that, even once these were applied, ExxonMobil calculated that Issa had an outstanding balance of $162,646.89. (Issa Aff. Ex. 21.)  The letter set out a proposed payment schedule and also expressed willingness to discuss a buyout.  (Id.)

After being placed on prepay status in July 2007, plaintiffs concededly did not purchase or sell any additional gasoline at the Gun Hill Station.  (Def. 56.1 ¶ 26; Pl. 56.1 ¶ 26.) Plaintiffs also admit that they did not pay any rent from August through December 2007.  (Def. 56.1 ¶ 27; Pl. 56.1 ¶ 27.)

On January 8, 2008, Duffy sent Issa a letter on behalf of ExxonMobil terminating the Franchise Agreement "along with all related supplemental agreements, effective April 17, 2008" (the "Termination Letter").  (Finn Decl. Ex. 11.)  The Termination Letter stated three grounds: (1) "[f]ailure to operate [the] service station for the sale of motor fuel for at least seven (7) consecutive days, beginning July 8, 2007 [and] continuing through and possibly beyond January 1, 2008"; (2) failure to pay ExxonMobil amounts due totaling $326,749.04, including $106,041.50 in rent charges; and (3) violation of provisions of the Franchise Agreement requiring that Issa use his best efforts to maximize the sale of fuel and pay amounts due to ExxonMobil in a timely manner.  (Id.)  Issa vacated the Gun Hill Station on February 4, 2008. (Issa Aff. ¶ 86.)

b.  Oral Modification Of The Franchise Agreement

Much of this case turns on whether the parties made a binding oral modification to the Franchise Agreement that relieved plaintiffs of the obligation to pay rent at the Gun Hill

8

Station until ExxonMobil remedied the construction and equipment problems that followed construction of OTR site.  The parties assume in their briefing that New York law governs modification of the Franchise Agreement and the Court will do the same.  See Fed. Ins. Co. v. American Home Assur. Co., 639 F.3d 557, 566 (2d Cir. 2011).

The Franchise Agreement states that, "[e]xcept for those permitted to be made unilaterally by ExxonMobil under this Agreement, no amendment, change or variance from this Agreement is binding on either Party unless agreed in writing by the Franchise Dealer and ExxonMobil's authorized representative."  (Finn Decl. Ex. 7 § 20.8.)  This provision is enforceable under N.Y. Gen. Oblig. Law § 15-301(1), which, abrogating the common law rule in New York, "places this type of clause on the same footing as any other term in a contract." Israel v. Chabra, 12 N.Y.3d 158, 163, 167 (2009).  Section 15-301(1) provides that "[a] written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent."  N.Y. Gen. Oblig. Law § 15-301(1).  Thus, under the statute, when a contract prohibits oral modifications, "if the only proof of an alleged agreement to deviate from a written contract is the oral exchanges between the parties, the writing controls."  Rose v. Spa Realty Assocs., 42 N.Y.2d 338, 343 (1977).  Here, there is no evidence in the record of a writing by an ExxonMobil representative agreeing to modify the Franchise Agreement.

Plaintiffs invoke two judicially recognized exceptions to the statute: the doctrines of partial performance and equitable estoppel.  As discussed below, however, no reasonable jury could find that the conduct of any party was inconsistent with the Franchise Agreement as written, and plaintiffs are therefore precluded as a matter of law under N.Y. Gen. Oblig. Law §

15-301(1) from relying on any purported oral modification to the Franchise Agreement.  See Towers Charter & Marine Corp. v. Cadillac Ins. Co., 894 F.2d 516, 522 (2d Cir. 1990) ("[F]or either exception to apply, the conduct claimed to have resulted from the oral modification must be conduct that is inconsistent with the agreement as written."); Richardson & Lucas, Inc. v. New York Athletic Club of City of New York, 304 A.D.2d 462, 463 (1st Dep't 2003) ("Neither exception is available, however, unless the part performance or the acts taken in detrimental reliance are 'unequivocally referable' to the new, oral agreement.") (quoting Rose, 42 N.Y.2d at 343).

        i.  Partial Performance

Under New York law, "[p]artial performance of an oral agreement to modify a written contract, if unequivocally referable to the modification, avoids the statutory requirement of a writing." Rose, 42 N.Y.2d at 341.  Plaintiffs rely on documentary evidence demonstrating that ExxonMobil did not charge plaintiffs rent between the opening of the renovated station in December 2005 and September 14, 2006, and that ExxonMobil later gave Issa retroactive rent credits for most of February through July 2007.  (Issa Aff. Exs. 5, 23.)  Plaintiffs contend that ExxonMobil's failure to charge plaintiffs rent constitutes partial performance of the purported oral modification because, under the orally modified contract argued for by plaintiffs, ExxonMobil was not entitled to charge any rent for these periods.

Plaintiffs' partial performance argument fails because ExxonMobil's actions are not "unequivocally referable to the modification," and therefore do not "avoid[] the statutory requirement of a writing."  Rose, 42 N.Y.2d at 341.  While ExxonMobil's actions are consistent with an oral modification, they are just as easily explained as an attempt to improve a strained business relationship with a franchisee and help keep that franchisee selling gasoline for the

parties' mutual benefit.  Indeed, this explanation is stated in ExxonMobil's July 17, 2007 letter to Issa announcing the retroactive rent credits: "in order to assist you, we have made a business decision to give you retroactive credit . . . ."  (Issa Aff. Ex. 23.)  Such conduct is fully consistent with the Franchise Agreement, under which ExxonMobil's right to demand "strict compliance" with any of the franchisee's obligations under the agreement is not "waived or impaired" by ExxonMobil's failure to timely exercise a right or insist upon strict compliance, its waiver of a prior default, its forbearance, or any course of dealing between the parties.  (Finn Decl. Ex. 7 § 20.3.)  In light of this provision and the relationship among the parties, ExxonMobil's decision to waive some of plaintiffs' rent was hardly "unintelligible" or "extraordinary," Anostario v. Vicinanzo, 59 N.Y.2d 662, 664 (1983) (citation and quotation marks omitted), or "inconsistent with any other explanation."  Richardson & Lucas, Inc., 304 A.D.2d at 463.  Thus, ExxonMobil's decision to waive rent payments to which it was entitled was not inconsistent with the Franchise Agreement as written, did not constitute a waiver of ExxonMobil's right to charge rent in the future, and was at best equivocal with regard to the existence of an oral modification.

   ii.   Equitable Estoppel

         Under New York law, "when a party's conduct induces another's significant and substantial reliance on the agreement to modify, albeit oral, that party may be estopped from disputing the modification notwithstanding the statute."  Rose, 42 N.Y.2d at 341.  "Comparable to the requirement that partial performance be unequivocally referable to the oral modification, so, too, conduct relied upon to establish estoppel must not otherwise be compatible with the agreement as written."  Id. at 344.

         Plaintiffs contend that Issa relied on the purported oral modification in running the Gun Hill Station.  Plaintiffs have failed, however, to identify evidence in the record of any

business decision Issa took in reliance on the purported oral modification that would be incompatible with the Franchise Agreement as written.  Plaintiffs' conclusory statements that "[Issa] relied on his oral agreement with ExxonMobil not to be charged rent" and "based his business decisions and ran [G]un Hill Road based upon that agreement" do not create a genuine issue of material fact.  (Pl. Br. 26.)  Nor were plaintiffs able, when asked at oral argument, to articulate a basis for equitable estoppel as it relates to oral modification of the Franchise Agreement.  (Tr. 15.)  Thus, plaintiffs have failed to carry their burden of coming forward with any evidence of Issa's reliance on the purported oral modification—much less evidence of conduct "not otherwise . . . compatible with the agreement as written."  Rose, 42 N.Y.2d at 344.

### c.   ExxonMobil's Performance Under The Franchise Agreement

#### i.   Count I—Breach of Contract

Count I alleges that ExxonMobil breached the Franchise Agreement when it ceased delivering gasoline to the Gun Hill Station on July 8, 2007, a time at which plaintiffs claim to have been in material compliance with the Franchise Agreement.  (Compl. ¶¶ 99-104.)

The Franchise Agreement requires that plaintiffs exercise best efforts to maximize the sale of ExxonMobil's "Products," i.e. ExxonMobil's gasoline, at the Gun Hill Station and "shall pay ExxonMobil the price that is in effect at the time of loading of the delivery vehicle." (Finn Decl. Ex. 7 §§ 2.1, 2.2.)  The Franchise Agreement further provides that "[e]xcept to the extent ExxonMobil extends credit to Franchise Dealer . . . Franchise Dealer shall . . . pay for Products and services prior to delivery and provision of services."  (Id. § 2.3.)  ExxonMobil was not obligated to extend plaintiffs credit: "In its sole discretion, ExxonMobil may extend credit to Franchise Dealer on terms and conditions as specified by ExxonMobil . . . ."  (Id. § 2.4(a).) Finally, in the event that "Franchise Dealer defaults in the payment of any obligation or

indebtedness to ExxonMobil (including any indebtedness arising from purchases under this Agreement) . . . ExxonMobil may without notice or demand . . . immediately suspend deliveries of all Products" to plaintiffs.  (Id. § 2.4(d).)

It is undisputed that, after plaintiffs were put on prepay status in July 2007, plaintiffs did not pay for any gasoline and ExxonMobil did not deliver any.  (Def. 56.1 ¶ 26; Pl. 56.1 ¶ 26.)  In light of the above provisions, it is apparent that ExxonMobil was fully within its rights under the Franchise Agreement when it required that plaintiffs pay in advance for gasoline.  Nor is there merit in plaintiffs' contention that monies drafted by ExxonMobil to pay for rent should have been put towards gasoline, as the Court has already held that there was no binding oral modification of the Franchise Agreement and therefore ExxonMobil was entitled to charge half rent as of March 2006 (three months following completion) and full rent as of July 2006 (seven months following completion).  (Finn Decl. Ex. 10; Issa Dep. 242.)  Thus, because the Franchise Agreement as written required that plaintiffs pay rent and prepay for gasoline when ExxonMobil required it, and because there was no binding oral modification of the Franchise Agreement varying these terms, ExxonMobil was within its rights when it ceased delivering gasoline to plaintiffs in July 2007.  ExxonMobil is therefore entitled to summary judgment on Count I.

  ii. <u>Count III—Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

Count III alleges that ExxonMobil breached the implied covenant of good faith and fair dealing in the Franchise Agreement by failing to deliver gasoline and withdrawing funds from plaintiffs' account for rent when, according to plaintiffs, none was due owing to an oral modification to the Franchise Agreement.  (Compl. ¶¶ 111-115.)

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance . . . embrac[ing] a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." 511 West 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153 (2002) (citations and quotation marks omitted). "[T]he duties of good faith and fair dealing . . . encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included." Id. Thus, "where a contract contemplates the exercise of discretion, the covenant of good faith and fair dealing 'includes a promise not to act arbitrarily or irrationally in exercising that discretion.'" Sveaas v. Christie's Inc., 452 Fed. App'x 63, 66 (2d Cir. 2011) (quoting Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995)). "No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship." Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 304 (1983). Thus, the implied covenant "does not add[] to the contract a substantive provision not included by the parties." Broder v. Cablevision Sys. Corp., 418 F.3d 187, 199 (2d Cir. 2005) (citation and quotation marks omitted) (brackets in Broder).

Here, as just discussed, the express, unmodified terms of the Franchise Agreement allowed ExxonMobil to stop delivering gas if plaintiffs did not pay for it in advance and required that plaintiffs begin paying the full monthly rent seven months after completion of the construction in December 2005, i.e. starting in July 2006. The implied covenant of good faith and fair dealing does not modify these express terms of the contract. See Murphy, 58 N.Y.2d at 304. Moreover, plaintiffs have failed to point to any evidence in the record suggesting that ExxonMobil exercised its rights to charge rent or require prepayment "arbitrarily, irrationally or in bad faith." Sveaas, 452 Fed. App'x at 66. Plaintiffs have not come forward with evidence

14

that ExxonMobil did anything more than "act[] in its own self-interest consistent with its rights under a contract." Suthers v. Amgen Inc., 441 F. Supp. 2d 478, 485 (S.D.N.Y. 2006) (Castel, J.) (citing State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 168-71 (2d Cir. 2004)). Thus, because the implied covenant of good faith and fair dealing does not modify the express terms of the Franchise Agreement, and because there are no genuine issues of material fact concerning ExxonMobil's good-faith compliance with its obligations under the Franchise Agreement, ExxonMobil is entitled to summary judgment on Count III.

      d.  Termination Of The Franchise Agreement

Count VIII alleges that ExxonMobil wrongfully terminated the Franchise Agreement, in violation of the PMPA. (Compl. ¶¶ 141-149.) ExxonMobil argues that it is entitled to summary judgment on Count VIII because termination of the Franchise Agreement was proper under the PMPA. It relies on two of the grounds stated in the Termination Letter: (1) failure to pay ExxonMobil amounts due (specifically, rent for August 2007 through December 2007) and (2) failure to operate the Gun Hill Station for at least seven consecutive days, beginning July 8, 2007 and continuing through and possibly beyond January 1, 2008. (Finn Decl. Ex. 11.)

Congress enacted the PMPA "to establish 'protection for franchisees from arbitrary or discriminatory termination or non-renewal of their franchises.'" Bellmore v. Mobil Oil Corp., 783 F.2d 300, 304 (2d Cir. 1986) (quoting S. Rep. No. 731, 95th Cong., 2d Sess. 15). More specifically, "[t]he PMPA is primarily concerned with attempts by franchisors to discriminate against a particular franchisee or to extract an unfair concession based upon the franchisor's superior bargaining power." King Serv., Inc. v. Gulf Oil Corp., 834 F.2d 290, 294 (2d Cir. 1987); see also Darling v. Mobil Oil Corp., 864 F.2d 981, 984 (2d Cir. 1989) (noting

PMPA's secondary goals of "providing nationwide uniformity in franchise relationships and permitting franchisor flexibility"). To this end, the PMPA "prohibits termination of any franchise relationship unless the franchisor can show that such termination is based upon a ground described in § 2802(b)(2)," Russo v. Texaco, Inc., 808 F.2d 221, 225 (2d Cir. 1986), and creates a private right of action for damages and other relief that a franchisee may assert against a franchisor who fails to comply with the PMPA's requirements. 15 U.S.C. § 2805(a). The franchisee bears the burden of proving the termination of the franchise relationship, while the franchisor bears the burden of going forward with evidence to establish as an affirmative defense that such termination was permitted under the PMPA. Id. § 2805(c).

The PMPA permits termination of a franchise agreement, inter alia, upon "[t]he occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise . . . is reasonable," provided "such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence" within the time specified by the statute. 15 U.S.C. § 2802(b)(2)(C). Section 2802(c) elaborates on this basis for termination by providing twelve examples of such events, two of which have been raised by ExxonMobil: first, a "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled," and second, a "failure by the franchisee to operate the marketing premises for . . . 7 consecutive days . . . ." 15 U.S.C. §§ 2802(c)(8), (9)(A). The term "failure," which appears in both events raised by ExxonMobil, is defined in the PMPA to exclude inter alia, "any failure for a cause beyond the reasonable control of the franchisee . . . ." 15 U.S.C. § 2801(13)(B).

Plaintiffs concede that they did not purchase or sell any additional gasoline at the Gun Hill Station after July 2007 and that they did not pay any rent from August through

December 2007.  (Def. 56.1 ¶¶ 26, 27; Pl. 56.1 ¶¶ 26, 27.)  As noted above, the unmodified terms of the Franchise Agreement required that they do these things.  Plaintiffs argue, however, that these failures were beyond their reasonable control, and therefore do not constitute valid grounds for termination under the PMPA.  ExxonMobil responds that the Second Circuit's holding in Russo v. Texaco, Inc., 808 F.2d 221 (2d Cir. 1986), forecloses such an inquiry.  That contention rests on an over-reading of Russo.  In that case, the Second Circuit considered whether Texaco's loss of the "Getty" trademark pursuant to an FTC order constituted "an event which is relevant to the franchise relationship and as a result of which termination of the franchise is reasonable," as provided in 15 U.S.C. § 2802(b)(2)(C).  Recognizing that 15 U.S.C. § 2802(c)(6) enumerates the "loss of the franchisor's right to grant the right to use the trademark which is the subject of the franchise" as an event justifying termination, the Second Circuit considered whether the loss of the "Getty" mark constituted a per se reasonable basis for termination, or whether further inquiry was required.  It concluded that "if an event falls within the enumerated list, termination is conclusively presumed to be reasonable as a matter of law," and, hence, "[o]nce having ascertained that an event is encompassed by one of the twelve enumerated events, a court need make no further inquiry as to the reasonableness of the termination."  Russo, 808 F.2d at 225.  Russo's conclusive presumption applies to the failure to pay in a timely manner and the failure to operate for seven conservative days.

But, contrary to ExxonMobil's contention, there is nothing in Russo to suggest that, in determining "if an event falls within the enumerated list," 808 F.2d at 225, a court should disregard the statutory definition of "failure."  The Second Circuit held that an "event" enumerated in Section 2802(c) constitutes a per se reasonable ground for termination.  It did not hold that a franchisor's inability to pay amounts due or to operate the premises for seven

consecutive days constitutes an enumerated event under Sections 2802(c)(8) and (9)(A),

respectively, regardless of whether it be caused by a circumstance beyond the franchisee's

reasonable control.  Under the plain meaning of the statute, ascertaining whether an event is one

enumerated in Section 2802(c) requires, in the case of the "failures" enumerated in Sections

2802(c)(8) and (9), consideration of whether the event was "beyond the reasonable control of the

franchisee."  15 U.S.C. § 2801(13)(B).  Moreover, the event at issue in Russo (the loss of a

trademark) was not dependant on a franchisee "failure," and thus the definition of failure was not

before the Second Circuit.  Thus, the Court concludes, in accord with several courts of appeals,

that the language of the PMPA requires that the term "failure" in Sections 2802(c)(8) and (9)

must be read in light of the definition of that term in Section 2801(13).  Accord  Joseph v.

Sasafrasnet, LLC, 689 F.3d 683, 691-93 (7th Cir. 2012); Chevron U.S.A., Inc. v. El-Khoury, 285

F.3d 1159, 1163 (9th Cir. 2002); Patel v. Sun Co., 141 F.3d 447, 458 (3d Cir. 1998); Hinkleman

v. Shell Oil Co., 962 F.2d 372, 367-77 (4th Cir. 1992).[4]

  Here, in considering whether plaintiffs' failure to pay rent and operate the Gun

Hill Station constitute per se reasonable grounds for termination of the Franchise Agreement, the

Court notes that, while the Second Circuit has yet to examine the definition of "failure" in the

PMPA, several district courts have held that general economic hardship—a "plain, ordinary

failure to pay a debt for shortage of cash"—cannot excuse a failure under Section 2801(13)(B).

Cal. Petroleum Distrib. Inc. v. Chevron U.S.A. Inc., 589 F. Supp. 282, 288 (E.D.N.Y. 1984); see

ABJO Motors, Inc. v. Shell Oil Co., 856 F. Supp. 656, 658 (S.D. Fla. 1994); Cantrell v. Exxon

---

[4] At oral argument, defendant's counsel placed considerable emphasis on Zipper v. Sun Co., 947 F. Supp. 62 (E.D.N.Y. 1996).  (Tr. 41.)  In considering termination for failure to pay sums due under 15 U.S.C. § 2802(c)(8), that court determined, without citing the statutory definition of failure, that the court's "inquiry is thus restricted to determining whether plaintiff paid all sums due to defendant in a timely manner."  Zipper, 947 F. Supp. at 67.  For the reasons discussed above, that reasoning overstates the holding in Russo and impermissibly negates the statutory definition of "failure."

Co. U.S.A., 574 F. Supp. 313, 317 (M.D. Tenn. 1983).  This much plaintiffs concede.  (Tr. 29.)

There is, on the other hand, some support for the proposition that a franchisor's conduct can

render a franchisee's failure beyond his reasonable control.  See Roberts v. Amoco Oil Co., 740

F.2d 602, 608 & n.2 (8th Cir. 1984) (citing Marini v. Atl. Richfield Co., 475 F. Supp. 142, 144-

45 (D.N.J. 1979)).

   Nevertheless, plaintiffs expressly conceded at oral argument that the existence of

an enforceable oral modification of the Franchise Agreement and a claim for termination of the

Franchise Agreement go "hand in hand," such that, should the Court conclude that there was no

binding oral modification of the Franchise Agreement, Count VIII necessarily fails—"like a

domino effect."  (Tr. 50.) [5]  Thus, plaintiffs concede that, in the absence of a binding oral

modification of the Franchise Agreement, the "beyond the reasonable control of the franchisee"

argument fails.  Because no reasonable jury could conclude that plaintiffs did not fail to pay

defendants in a timely fashion and did not fail to operate the station for seven consecutive days,

ExxonMobil is entitled to summary judgment on Count VIII.

   e. Termination Of The OTR Agreement

   Counts V and VII allege that ExxonMobil breached the express terms of the OTR

Agreement, as well as the implied covenant of good faith and fair dealing, by its improper

---

[5] The Court posed the following question to plaintiffs' counsel:

> In order to make out a 13(b) circumstance that any failure to operate the station was a cause
> beyond the reasonable control of the franchisee and any failure to pay the rent, or pay an
> obligation due, was beyond the reasonable control of the franchisee, it is necessary for me to find
> that there was an oral modification that was enforceable.  Is that correct?

(Tr. 50.)  The response of plaintiffs' counsel was as follows:

> It would seem to me that you would have to find that agreement to be enforceable. It's like a
> domino effect.  The pieces have to fall together.  And that's how the pieces fell.  So yes.

(Id.; see also id. at 51.)

termination of that agreement.  (Compl. ¶¶ 121-126; ¶¶ 134-140.)  ExxonMobil argues that

Counts V and VII are preempted by the PMPA's express preemption provision.  15 U.S.C. §

2806(a)(1).  Having concluded that the Franchise Agreement was validly terminated, however,

the Court need not address this argument.  It suffices to observe that the OTR Agreement

contains provisions that either terminate or permit termination of the OTR Agreement in the

event that the Franchise Agreement is terminated.

### i.  Count V—Breach of Contract

The OTR Agreement states that it "is contingent upon Franchise Dealer having

entered into ExxonMobil's standard PMPA Franchise agreement," that "the Franchise is a

'Related Business' as defined in the PMPA Franchise Agreement and is subject to the provision

of that agreement," that "Franchise Dealer may operate the Franchise only in connection with an

Exxon-branded or Mobil-branded motor-fuels business at the Marketing Premises and not as an

independent business," and that ExxonMobil may terminate the OTR Agreement if the Franchise

Dealer fails to comply with the provisions of the Franchise Agreement or if the Franchise

Agreement is terminated.  (Finn Decl. Ex. 8 §§ 2.02, 2.04, 7.08, 14.04(c), 14.04(u).)  Moreover,

"termination . . . of the PMPA Franchise Agreement . . . automatically triggers termination . . . of

this Agreement," and, "based on the highly integrated nature of the motor fuels operations and

convenience store operations at the Marketing Premises, any termination [other than by mutual

agreement] . . . of this Agreement automatically triggers termination . . . of the PMPA Franchise

Agreement . . . ."  (Id. § 14.05(C).)[6]

---

[6] Although the OTR Agreement states that it is governed by Virginia law (Finn Decl. Ex. 8 § 19.10), the parties have presented arguments to this Court on the assumption that it is governed by New York law, and the Court will again apply New York law.  See Fed. Ins. Co., 639 F.3d at 566.

Plaintiffs have not suggested any reason why the OTR Agreement's cross-default provisions are not valid and enforceable, nor is the Court aware of any.  Having concluded that the Franchise Agreement was validly terminated, and further that the OTR Agreement contains cross-default provisions that are valid and enforceable, it follows that there are no genuine issues of fact concerning termination of the OTR Agreement, which was validly terminated pursuant to its cross-default provisions upon the valid termination of the Franchise Agreement.  Thus, ExxonMobil is entitled to summary judgment on Count V.

> ii.  <u>Count VII—Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

Count VII alleges that ExxonMobil's termination of the OTR Agreement breached the implied covenant of good faith and fair dealing in that agreement.  As discussed, ExxonMobil was entitled to terminate the OTR Agreement upon valid termination of the Franchise Agreement.  The implied covenant of good faith and fair dealing does not vary the OTR Agreements' express cross-default provisions.  <u>See</u> <u>511 West 232nd Owners Corp.</u>, 98 N.Y.2d at 153.  Moreover, plaintiffs have not pointed to any evidence in the record suggesting that ExxonMobil acted arbitrarily, irrationally, or in bad faith in terminating the OTR Agreement.  <u>Sveaas</u>, 452 Fed. App'x at 66.  ExxonMobil is therefore entitled to summary judgment on Count VII.

> f.  <u>ExxonMobil's Performance Under The OTR Agreement</u>

Count VI alleges that ExxonMobil breached the implied covenant of good faith and fair dealing in the OTR Agreement prior to termination.  (Compl. ¶¶ 127-133.)  Specifically, Count VI alleges that ExxonMobil repeatedly changed its mind concerning whether the Gun Hill Station should be converted to an OTR site, failed to construct the OTR site within a reasonable

time period, and refused to acknowledge or correct the construction and equipment problems at the site.  (Id. ¶ 128.)

   First, as it relates to events predating the parties' entry into the OTR Agreement, Count VI fails as a matter of law, as ExxonMobil could not have breached an implied covenant of an agreement that did not yet exist.  See Restatement (Second) of Contracts § 205 cmt. c (noting that pre-contract negotiations are governed by other doctrines, such as fraud and duress, but not the implied covenant of good faith and fair dealing).

   Second, ExxonMobil is entitled to summary judgment on Count VI insofar as it is premised on delayed construction.  Plaintiffs acknowledge that construction was complete by December 2005.  (Issa Dep. 242).  Plaintiffs further conceded at oral argument that any delay in beginning and completing construction of the OTR site was not material and resulted from the need to obtain necessary permits.  (Tr. 32-33.)

   The third aspect of Count VI, relating to problems encountered at the Gun Hill Station after construction was complete, requires lengthier discussion.  Viewing the evidence in the light most favorable to plaintiffs, the non-movants, a reasonable jury could find that, after reopening in December 2005, the OTR site encountered significant problems caused in part by ExxonMobil.  Specifically, Issa's affidavit states that the site encountered problems with its computer system, refrigeration equipment, heating and cooling system, circuit breakers, and cooler gauges.  (Issa Aff. ¶ 40.)  Issa also states that rain water leaked into the storage area and back office, plastic moldings were loose, and the store lacked advertising banners out front.  (Id.)  Moreover, a reasonable jury could conclude, based on the fact that such problems persisted in the face of Issa's constant requests for assistance from ExxonMobil, that ExxonMobil did not make a good-faith effort to address the post-construction problems encountered at the Gun Hill Station.

(Id. ¶¶ 32-43, 53, 56-58.)  The question remains whether, and to what extent, ExxonMobil could be held liable for failing to address these problems.

The OTR Agreement states that ExxonMobil will "cause the Work to be performed and completed in a workmanlike manner. . . ."  (Finn Decl. Ex. 8, Schedule B § 3(A).)[7]  ExxonMobil points out, however, that the OTR Agreement contains broad disclaimers:

> EXXONMOBIL MAKES NO REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, CONCERNING THE PLANS, DESIGNS, SPECIFICATIONS, EQUIPMENT, FIXTURES AND IMPROVEMENTS DESCRIBED IN THIS SCHEDULE B AND IN ATTACHMENTS 1 AND 2, INCLUDING, WITHOUT LIMITATION, WARRANTIES AS TO FITNESS FOR A PARTICULAR PURPOSE AND WARRANTIES AS TO MERCHANTABILITY.
>
> EXXONMOBIL IS NOT LIABLE FOR ANY LOSS OF BUSINESS REVENUES INCURRED BY FRANCHISE DEALER AS A RESULT OF THE WORK PEFORMED UNDER THIS AGREEMENT AT THE MARKETING PREMISES AND MAKES NO GUARANTEES REGARDING THE DURATION OF THAT WORK.

(Finn Decl. Ex. 8, Schedule B § 3(B) (emphasis in original).)  These provisions disclaim any representations or warranties on ExxonMobil's part concerning the malfunctioning Equipment[8] at the Gun Hill Station and also prohibit plaintiffs from recovering consequential damages for

---

[7] "Work" is defined in OTR Agreement to mean "all work undertaken to remodel and convert a portion of the Marketing Premises into a Store, as provided in Section 4.01 and Schedule B."  (Finn Decl. Ex. 8, Appendix.) "Work" is further described in Schedule B as follows:

> The remodeling and conversion work will be referred to as the "Work" and will include, without limitation, (1) the installation of all Equipment as required by ExxonMobil under the Franchise Program, (2) the construction of or modification to improvements and fixtures at the Marketing Premises, and (3) the installation of such signs and marketing as ExxonMobil deems necessary to identify the Marketing Premises as part of the Franchise Program.

(Finn Decl. Ex. 8, Schedule B § 1.)

[8] "Equipment" is defined in the OTR Agreement to mean "the equipment and fixtures (as specified by ExxonMobil) that are required for a store to be included in the franchise Program, along with any optional equipment and fixtures specified by Franchise Dealer (and approved by ExxonMobil)."  (Finn Decl. Ex. 8, Appendix.)

lost business revenue as a result of the Work performed.  They do not, however, override ExxonMobil's obligations with respect to workmanlike construction.

        In light of the above-referenced disclaimers, which disclaim any representations or warranties concerning the Equipment, ExxonMobil cannot be held liable for the initial quality of the Equipment installed in the OTR site.  Furthermore, the OTR Agreement makes GHRSS, not ExxonMobil, responsible for store maintenance, including the maintenance of Equipment. (Finn Decl. Ex. 8 § 7.04(O).)[9]  The one exception that the Court has identified relates to the store's computer system, for which "ExxonMobil . . . shall provide . . . reasonable maintenance services . . . all at Franchise Dealer's expense."  (Finn Decl. Ex. 8 § 5.03(B).)  Thus, insofar as Count VI relates to malfunctioning Equipment, it survives summary judgment only to the extent that it relates to ExxonMobil's failure to maintain the Gun Hill Station's computer system in working order.

        Aside from malfunctioning Equipment, some of the problems encountered at the OTR site could give rise to an inference that the initial construction of the OTR site was not performed in a workmanlike manner.  In particular, Issa's statements that the heating and cooling system and circuit breakers malfunctioned, that rain leaked in the storage area and back office, and that plastic moldings were loose all suggest, aside from any defects in the purchased Equipment or the need for subsequent maintenance, that the site was not properly constructed in

---

[9] Section 7.04(O) states as follows:

> Franchise Dealer shall maintain the Store and all adjacent areas in clean, attractive and functional condition at all times, and maintain all Equipment in operating condition.  Franchise Dealer shall, at Franchise Dealer's expense, undertake all maintenance and make all repairs, replacements, alternations, and additions as may be required for that purpose, including, without limitation, periodic cleaning, repainting, repairs, and replacement of obsolete signs, Equipment, fixtures, and furnishings as ExxonMobil may reasonably require.

(Finn Decl. Ex. 8 § 7.04(O).)

the first instance.  (Issa Aff. ¶ 40.)  Thus, there remains a triable issue of fact concerning

ExxonMobil's good-faith efforts to comply with its obligation under the OTR Agreement to

"cause the Work to be performed and completed in a workmanlike manner . . . ."  (Finn Decl.

Ex. 8, Schedule B § 3(A).)  As discussed, however, plaintiffs will not be able to recover lost

business revenue in connection with this claim, even if they prevail at trial.

    In summary, ExxonMobil is entitled to summary judgment on Count VI except as

it relates to (1) maintenance of the Gun Hill Store's computer system and (2) whether the initial

construction of the OTR site was performed in a workmanlike manner.

III. <u>Claims Related To The City Island Avenue Station</u>

    Plaintiffs also allege that ExxonMobil tortiously interfered with Issa's prospective

business relationship with the landlord at another gas station, located on City Island Avenue.

ExxonMobil responds that its conduct was not sufficiently culpable to constitute tortious

interference with prospective business relations and that, in any case, the claim is untimely.

    a. <u>Factual Background</u>

    The following facts are either not in dispute or, where there is a dispute, the

evidence is viewed in the light most favorable to plaintiffs, as the non-movants.

    Non-party Michael Innella is the President and, together with his wife, joint

owner of Islex, Inc. ("Islex"), the landlord of the premises at 410 City Island Ave., Bronx, New

York (the "City Island Station").  (Innella Aff. ¶ 1; Innella Dep. 27.)  Innella purchased the

premises in 1987 and operated an Exxon-brand gas station there until May 12, 1995, when he

leased the City Island Station to Sunoco, Inc. ("Sunoco").  (Innella Dep. 11, 17.)  The lease with

Sunoco had an initial five-year term that renewed automatically unless terminated on ninety

days' written notice.  (Inella Aff. ¶¶ 2, 3.)  During the term of the lease, Sunoco sublet the City

Island Station to City Island Sunoco, Inc., an entity controlled by Issa, who operated the City Island Station as a Sunoco-brand gas station with a repair shop.  (Innella Aff. ¶ 4; Innella Dep 12.)

On or about November 5, 2004, Sunoco informed Islex by letter that Sunoco did not intend to renew its lease of the City Island Station, which would expire effective November 12, 2005.  (Innella Aff. ¶ 5; Innella Dep. 26.)  After discussing the matter with Issa, Innella told Issa that Innella would give Issa a twenty-year lease for the City Island Station if Issa could bring in a major oil company, such as ExxonMobil, that would be willing to make a significant investment to upgrade the City Island Station through, for example, replacing the underground storage tanks, installing new gas pumps, and installing a canopy.  (Innella Aff. ¶¶ 7, 8; Innella Dep. 44-52.)

In the months that followed, two ExxonMobil representatives gave Innella inconsistent feedback regarding a potential deal with ExxonMobil at the City Island Station. ExxonMobil's New Business Manager, Pat Secchiaroli, indicated to Innella over the course of several exchanges that ExxonMobil would be interested in leasing the City Island Station if Jose Montero were the franchisee instead of Issa.  (Innella Aff. ¶¶ 9, 10; Issa Aff. ¶ 92.)  Later, at a lunch meeting in March 2005 at which Issa was present, Mike Gallagher of ExxonMobil told Innella that ExxonMobil was interested in a lease that would keep Issa as the franchisee of the City Island Station.  (Innella Aff. ¶ 11; Issa Aff. ¶ 94.)  Gallagher told Innella that ExxonMobil was willing to guarantee Issa's rent payments and advance Issa a significant sum of money to put toward improving the property.  (Innella Aff. ¶ 11.)  Gallagher agreed to send Innella written confirmation of this offer, but failed to do so and subsequently failed to return Innella's calls. (Innella Aff. ¶¶ 13, 14; Innella Dep. 59, 60.)

26

When ExxonMobil became nonresponsive for several weeks, Innella continued to explore other options for leasing the City Island Station.  (Innella Dep. 60.)  Innella continued negotiations with Tom Dickson, Vice President of Alta East, Inc. ("Alta East"), who had expressed interest in leasing the City Island Station in early 2005 and who visited the site on several occasions.  (Dickson Dep. 5, 27-29.)  On April 7, 2005, Alta East and Innella entered into a lease agreement for the City Island Station with a stated commencement date of November 1, 2005 (the "April 7 Lease").  (Finn Decl. Ex. 2; Dickson Dep. 34-37; Innella Aff. ¶ 15.)  Innella informed Issa of the April 7 Lease in early May 2005.  (Innella Aff. ¶ 16.)

By letter dated October 3, 2005, Sonoco informed Issa that Sonoco would not be renewing its lease at the City Island Station and that Sonoco was terminating and not renewing its franchise agreement with Issa, effective November 12, 2005.  (Issa Aff. Ex. 31; Issa Aff. ¶ 102.)

On or about October 7, 2005, Innella and Alta East executed an amendment to the April 7 Lease, changing the commencement date to November 13, 2005 in order to account for the fact that Sonoco's lease did not end until November 12, 2005.  (Innella Aff. ¶ 22; Dickson Dep. 39; Finn Decl. Ex. 5.)

On or about November 2, 2005, Issa commenced a lawsuit in this Court against Sunoco, Islex, and Alta East, seeking to enforce what he believed to be his right under the PMPA to have Sunoco's five-year option to extend its lease at the City Island Station assigned to him (the "City Island Litigation").  (Innella Aff. ¶ 23; Finn Decl. Ex. 4.)  Issa v. Sunoco, Inc., No. 05-cv-9291 (DLC) (S.D.N.Y.).  On November 15, 2005, on consent of the parties, Judge Cote entered a temporary restraining order restraining Sunoco from terminating its franchise relationship with Issa, restraining Islex from terminating Sunoco's occupancy of the premises,

and restraining Alta East from taking any actions to interfere with the contractual relationship between the other two parties.  (Issa Aff. Ex. 35.)  On December 8, 2005, while Issa and Innella were waiting in a courtroom, Issa suggested that he could still bring ExxonMobil into the deal if Innella would give Issa a lease.  (Issa Aff. ¶ 110: Innella Aff. ¶ 26.)  Innella responded that he was no longer interested in such a deal.  (Issa Aff. ¶ 111: Innella Aff. ¶ 27.)

On or about February 24, 2006, the parties to the City Island Litigation reached a settlement and thereafter stipulated to discontinuance of the case, which was terminated on April 4, 2006.  (Issa Aff. ¶ 112; Innella Aff. ¶ 29.)  Alta East and Islex entered into a second amendment to the April 7 Lease, changing the start date to March 1, 2006.  (Innella Aff. ¶ 28; Finn Decl. Ex. 6.)  Issa terminated his business operations at the City Island Station and delivered possession of the premises to Islex by March 1, 2006.  (Innella Aff. ¶ 30; Dickson Dep. 54.)

### b.  Tortious Interference With Prospective Contract

Count IX alleges that ExxonMobil tortiously interfered with Issa's prospective contract with Innella to lease the City Island Station.  (Compl. ¶¶ 150-153.)  The tortious interference claim fails for two independent reasons.  First, ExxonMobil is entitled to judgment as a matter of law because, even viewing the evidence in the light most favorable to plaintiffs, ExxonMobil's conduct did not rise to the required level of culpability.  Second, the claim is time barred.

### i.  Unlawful Means

A cause of action for tortious interference with prospective contractual relations requires that the plaintiff prove four elements: "(a) the plaintiff had business relations with a third party; (b) the defendant interfered with those business relations; (c) the defendant acted

with the sole purpose of harming the plaintiff or by using unlawful means; and (d) there was resulting injury to the business relationship." Thome v. Alexander & Louisa Calder Found., 70 A.D.3d 88, 108 (1st Dep't 2009) (citing Carvel Corp. v. Noonan, 3 N.Y.3d 182, 189-190 (2004); NBT Bancorp v. Fleet/Norstar Fin. Group, 87 N.Y.2d 614 (1996); Hoesten v. Best, 34 A.D3d 143, 159 (2006)).

        This case turns on the "unlawful means" element.  To satisfy this element, the New York Court of Appeals has held that, "as a general rule, the defendant's conduct must amount to a crime or an independent tort."  Carvel, 3 N.Y.3d at 190.  Thus, "[w]rongful means include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." Id. at 191 (citation and quotation marks omitted).  While the court in Carvel noted that "an exception has been recognized where a defendant engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs," it held that exception did not apply where the defendant's "motive in interfering . . . was normal economic self-interest." Id. at 190 (citation and quotation marks omitted).[10]  Notably, plaintiffs point to no evidence in the record suggesting that ExxonMobil acted with the sole purpose of harming plaintiffs, and hence there is no genuine dispute that ExxonMobil acted with a "normal economic self-interest." Id.  Further, as discussed below, ExxonMobil is entitled to summary judgment on Count IX because no reasonable jury could find that ExxonMobil committed any act rising to the level of culpable interference required to prevail on a claim for tortious interference with prospective business relations.

---

[10] The New York Court of Appeals reserved for another day the question whether other exceptions might exist for sufficiently "egregious" conduct not rising to the level of a crime or independent tort.  Carvel, 3 N.Y.3d at 191.

First, ExxonMobil's failure to participate in a three-way deal with Innella and Issa cannot constitute interference at all in light of New York's long-recognized privilege to select those with whom one does business.  See Turner Constr. Co. v. Seaboard Sur. Co., 98 A.D.2d 88, 90-91 (1st Dep't 1983).  Second, it is not sufficient that ExxonMobil's representatives encouraged Innella to do business with a franchisee other than Issa, as such acts of persuasion do not constitute crimes, independent torts, or arguably egregious conduct.  See, e.g., Steiner Sports Mktg., Inc. v. Weinreb, 88 A.D.3d 482, 483 (1st Dep't 2011) ("[T]he allegation that plaintiff's chief executive officer requested and convinced The Nelson Group to rescind the offer does not constitute the kind of wrongful or culpable conduct required to state a claim for tortious interference with prospective economic relationships.") (citing Carvel, 3 N.Y.3d at 190-91).[11] Third, plaintiffs' most serious contention concerns an alleged kickback request by an ExxonMobil employee.  Issa's affidavit states that Pat Secchiaroli "offered to 'undue the damage' that he had caused if I would pay him a kickback of $50,000.00," an offer which Issa declined.  (Issa Aff. ¶ 93.)  Although plaintiffs' counsel stated at oral argument that the kickback was not the focus of the tortious interference claim (Tr. 53), it is the only conduct at issue that could potentially constitute a crime or independent tort.  Nonetheless, the kickback cannot support plaintiffs' claim.  Even assuming that Secchiaroli's conduct could be attributed to ExxonMobil,[12] it was directed at Issa, not Innella, and therefore cannot supply the required

---

[11] At oral argument, plaintiffs' counsel repeatedly stated that ExxonMobil representatives "badmouthed" Issa when speaking to Innella.  (Tr. 54-57.)  The record is devoid, however, of any specifics regarding potentially actionable statements made by ExxonMobil representatives, and, when pressed at oral argument, plaintiffs' counsel was unable to provide any specific statements.  (Id.)

[12] An employee's rogue conduct—undertaken for the agent's exclusive benefit and in conflict with the interests of the principal—would not subject ExxonMobil to liability unless ratified by ExxonMobil, and there is no evidence of such ratification.  See, e.g., White v. Hampton Mgt. Co. L.L.C., 35 A.D.3d 243, 244 (1st Dep't 2006) (holding employer was not vicariously liable for employee's intentional torts because "the claimed acts were not part of his

interference.  See Carvel, 3 N.Y.3d at 192 ("[C]onduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship.").

ii.  Statute of Limitations

Plaintiffs' tortious-interference claim is also untimely.  Claims for tortious interference with prospective contractual relations are subject to a three-year statute of limitations.  CPLR § 214[4]; see Thome, 70 A.D.3d at 108.  For torts generally, "accrual occurs when the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint."  Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 94 (1993).  For tortious interference with prospective contractual relations, however, the First Department has held that the statute of limitations "begins to run when the defendant performs the action (or inaction) that constitutes the alleged interference.  It does not commence anew each time the plaintiff is unable to enter into a contract, unless the defendant takes some further step."  Thome, 70 A.D.3d at 108 (citing Kronos, 81 N.Y.2d at 94).

The parties do not cite Thome, relying instead on Union Carbide Corp. v. Montell N.V., No. 95 CIV. 0134(SAS), 1998 WL 474207 (S.D.N.Y. Aug. 12, 1998).  In that case, Judge Scheindlin reasoned that, because no claim for tortious interference with prospective business relations exists where a plaintiff was not "reasonably certain" to realize the business relationship absent the defendant's interference, a claim for tortious interference with prospective business relations accrues when the defendant's conduct impairs this reasonable certainty.  See id. at *2 (holding that "no rational juror could find it to have been reasonably certain that UCC would continue to sell polypropylene manufacturing licenses to RDS or its affiliates after the Letter of

---

job and would not have served his employer's interests," i.e. they "were done for purely personal motives and were an obvious departure from [his] normal duties").

Intent was signed").  Judge Scheindlin distinguished the New York Court of Appeals' holding in

Kronos, which dealt with tortious interference with an existing contract, noting that while "a

claim for tortious interference with an existing contract does not accrue until the plaintiff suffers

actual, pecuniary injury . . . [w]hen a prospective contract is tortiously interfered with . . . the

injury is to the plaintiff's relationship with its prospective business partner."  Id. at *2 n.1

(emphasis in original).  Although the approaches taken in Thome and Union Carbide differ

somewhat, they are consistent to the extent that a defendant's actions have the immediate effect

of impairing a plaintiff's reasonable certainty of consummating the contemplated relationship.

   Here, ExxonMobil's cold reception following the March 2005 lunch meeting

caused Innella to resume negotiations with Alta East, with which he signed a lease agreement for

the premises on April 7, 2005.  (Innella Aff. ¶ 15; Dickson Dep. 34-37.)  Plaintiffs argue that the

April 7 Lease was only "preliminary" and therefore did not impair Issa's reasonable certainty of

entering into a twenty-year lease at the City Island Station.  But even viewing the evidence in the

light most favorable to the non-movants, no reasonable jury could conclude that the April 7

Lease is anything but a complete, legally binding agreement.  It states in bold, capital letters that

it is "a legally binding contract" and is signed by Alta East's President, D.W. Porto, and by M.J.

Innella and Rose Innella on behalf of Islex.  (Finn Decl. Ex. 2.)  The thirteen-page document

contains detailed provisions governing monthly rent, assignment and subletting, insurance, and

other matters.  (Id.)  Although the lease's commencement date was later moved from November

1, 2005 to November 13 and then to February 7, 2006 (Finn Decl. Exs. 2, 5, 6.), this does not

indicate that the April 7 Lease was not legally binding when first signed.  Both amendments to

the April 7 Lease state that "[a]ll other terms and provisions of the Lease shall remain unchanged

and in full force and effect."  (Finn Decl. Exs. 5, 6.)  Thus, although there was contradictory

testimony from Innella and Tomas Dickinson of Alta East as to whether the April 7 Lease was final or "preliminary," the April 7 Lease, along with the subsequent amendments, speak for themselves.  (Dickinson Dep. 51; Innella Aff. ¶ 15.)   The same goes for a February 7, 2006 letter from Alta East's President to Innella (enclosing the second amendment to the April 7 Lease), which states that "[f]inally, it appears that we are ready to sign our contract, effective March 1, 2006."  (Issa Aff. Ex. 33.)  While it is not clear why Porto phrased his letter in this manner (it may be a reference to settlement of the City Island Litigation), no construction of the letter undercuts the unambiguous import of the original April 7 Lease.   Finally, there are statements in the affidavits of both Issa and Innella to the effect that, until November 11, 2005, the two parties continued to negotiate and discuss ways in which Issa might remain the franchisee at the City Island Station.  (Issa Aff. ¶ 104; Innella Aff. ¶ 17.)  To the extent these statements suggest that the April 7 Lease was not binding, they are flatly contradicted by the April 7 Lease and subsequent amendments.  To the extent that the statements are indicative of Issa and Innella's subjective understanding of the April 7 Lease's legal effect, they are not probative on the statute of limitations question, which is governed by an objective standard.

Plaintiffs also contend that the April 7 Lease was not enforceable when signed because a provision of the PMPA, 15 U.S.C. § 2802(c)(4), required Sunoco to offer to assign to plaintiffs Sunoco's five-year option to extend the underlying lease at the City Island Station.  Thus, plaintiffs argue that, owing to his rights under the PMPA, Issa did not lose his reasonable certainty of entering into a lease with Innella until he settled the City Island Litigation in February 2006, at which point his "hopes for City Island were dashed."  (Issa Aff. ¶ 112.)  Although the parties have not briefed the merits of the City Island Litigation, the statutory language does not support Issa's understanding of his rights.  Section 2802(c)(4) provides that

termination is reasonable upon "loss of the franchisor's right to grant possession of the leased

marketing premises through expiration of an underlying lease, if" among other things, "the

franchisor offers to assign to the franchisee any option to extend the underlying lease or option to

purchase the marketing premises that is held by the franchisor . . . ."  15 U.S.C. § 2802(c)(4)(B).

This requirement is limited, however, in that "the franchisor may condition the assignment upon

receipt by the franchiser of . . . an unconditional release executed by both the landowner and the

franchisee releasing the franchisor from any and all liability accruing after the date of the

assignment" for financial obligations under the option, environmental contamination, and the

operation or condition of the marketing premises.  15 U.S.C. § 2802(c)(4)(B).  Thus, it does not

appear that the PMPA granted Issa an unconditional right to stay on as the franchisee at the City

Island Station.[13]

       Ultimately, the Court need not speculate as to whether Issa could potentially have

prevailed in the City Island Litigation because, notwithstanding Issa's subjective belief that he

could still vindicate his right to have the lease assigned to him up until the City Island Litigation

settled, the April 7 Lease presented a significant obstacle to Issa's goal of entering into a twenty-

year lease with Innella.  Even if Issa might conceivably have prevailed in the City Island

Litigation, the fact that Innella chose to enter into the April 7 Lease—a facially binding

agreement that did not include Issa—demonstrated that Issa's prospective business relationship

with Innella had already been compromised.  Thus, regardless of the merits of the City Island

Litigation, "the injury . . . to [Issa's] relationship with [his] prospective business partner," Union

---

[13] Plaintiffs suggest that the mere fact that the parties to the City Island Litigation consented to a temporary restraining order maintaining the status quo indicates that Issa's position was meritorious.  ExxonMobil, in turn, argues that Issa's acceptance of what he describes as a "nominal settlement" to end the City Island Litigation suggests his claim lacked merit.  (Issa Aff. ¶ 112.)  Neither fact is particularly probative of the merits of the City Island Litigation.

Carbide, 1998 WL 474207, at *2 n.1 (emphasis in original), had already been done.  Moreover, ExxonMobil took no action to impede Issa's relationship with Innella after the April 7 lease was signed.  See Thome, 70 A.D.3d at 108 ("Even where, as here, the claim is based entirely on the assertion that the defendants' action (or inaction) had a negative effect on contractual relationships that plaintiff might later have had, the subsequent injuries alleged do not affect the timeliness issue.").  Thus, New York's three-year statute of limitations on a claim for tortious interference with prospective economic relations expired on April 7, 2008—three years after the April 7 lease was signed—and any such claim was untimely when the initial complaint was filed on September 12, 2008.

CONCLUSION

Plaintiffs request to withdraw Counts II, IV, and X of the Third Amended Complaint is granted, and those counts are DISMISSED.  Defendant's motion for summary judgment (Docket No. 93) is GRANTED in part and DENIED in part.  Defendant's motion is GRANTED as to Counts I, III, V, VII, VIII, and IX of the Third Amended Complaint.  Defendant's motion is DENIED as to Count VI of the Third Amended Complaint, which survives summary judgment only to the extent stated in this Memorandum and Order.  All pending motions are terminated.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
        February 1, 2013

35